## BEN BENNETT v. THE STATE.

### No. 2777. Decided June 1, 1904.

**1.—Evidence—Res Gestae—Murder.**

Where the testimony shows a continuation of the shooting on the part of appellant, from the time the first shot was fired until deceased was killed, it became a part of the res gestæ to show that he shot into the house where one of the assaulted parties was.

**2.—Evidence—Flight—Efforts to Find Defendant.**

Where the State proved flight, it was competent for the prosecution to show that efforts were made by the officers to find the whereabouts of defendant, as the extent of this inquiry would evidence the extent of his flight.

**3.—Evidence—Dying Declarations.**

Dying declarations, when proper predicate is laid, whether written or oral, are admissible in evidence on the trial of the case.

**4.—Charge of the Court—Impeachment Not Permitted by Negative Testimony.**

The dying declaration of deceased as shown by the defense was that she did not know who killed her; the State in rebuttal introduced witnesses that they

were with deceased a considerable time, but did not hear her make this statement. Held that it was error for the court to charge that the negative testimony of the State's witnesses can be considered for the purpose of discrediting the witnesses for the defense who had testified to said dying declarations.

**5.—New Trial—Failure to Object—Rights Lost.**

Where appellant in his motion for new trial, set up as a ground for new trial that the testimony of W., the undertaker, would show that the bullet found in the body of deceased was a 45-caliber, whereas the testimony showed that defendant's pistol was a 38-caliber, that said W. had been indicted for perjury for testifying to this fact on a former trial for the purpose of discrediting him as a witness, but had since been acquitted, and that when he testified on the last trial for defendant that he was still under said indictment for perjury, and that the State on cross-examination without objection of appellant brought out this fact, and that defendant was entitled to the above testimony untrammeled by the indictment for perjury of said witness, the motion was properly refused, because of said neglect to make proper objection at the proper time.

**6.—Same—Different Offenses.**

The rule where two are indicted for the same offense, are both tried and one is acquitted, that a new trial may be insisted upon for the testimony of the one who is acquitted, does not apply where they are indicted for different offenses.

**7.—Same—Party Under Indictment—Inadmissible.**

The fact that a party has been indicted on testimony given in the trial of a case then on hearing, can under no circumstances be proved on that trial, and would constitute reversible error, if excepted to at the proper time.

**8.—Practice—Disqualifying Witness.**

The effort of prosecuting attorneys to disqualify witnesses by indictment, severely condemned.

Appeal from the District Court of Hill. Tried below before Hon. Nelson Phillips.

Appeal from a conviction of murder in the second degree; penalty, eighteen years imprisonment in the penitentiary.

The testimony of the principal State's witness is substantially as follows: This difficulty took place about 2 o'clock in the afternoon on Sunday at the house of Fannie Evans. When I walked up there, defendant Ben Bennett was sitting on the outside of the house. I believe we had been to church together that day, but don't know whether we came back together. He was sitting out on the south side of the house in a chair at the time I walked up there, in front of the house, which was a two-room house, sitting east and west and facing south. There were two windows and two doors in the front side of the house. There were only two rooms and no halls to the house. There is a partition dividing the two-room building. There was no gallery in front, but some steps from the ground to the floor of the house. The front doors are about four or five or six or seven feet apart. Defendant's wife was sitting on the door steps and Dee Evans was sitting, or was back in the house in the west room. I was within four or five feet of Lula Bennett and Dee Evans. When I first walked up there, I think Dee and Joe and Bennett and Lula Bennett were talking about the shooting that had recently occurred at Day's Lake, near Waco. Dee Evans and Lula Bennett were doing the talking, I think. About the time they

ceased talking, a Mexican with candy for sale came along and Dee
Evans asked Lula Bennett if she wanted some candy. She replied no,
and he said if she did he would get it for her—he would pay for it.
She said she wouldn't eat any candy, or something of that kind. The
defendant then said, "Why in the hell don't you all hush that conver-
sation, throwing your damned hints at me," or something like that.
Dee Evans then asked him if he was talking to him or his wife; defend-
ant said, "I am talking to both of you." No one replied, but Dee Evans
arose and started into the east room. He was at that time at the door
of the west room. He started into the door of the east room; the door
was open at that time and about that time the defendant stepped in
front of the door. Evans passed through the middle door and went
into the east room, when defendant shot into the east room door, as he
stood in five or six feet of it. He just arose quickly from the chair,
stepped in front of the door and fired the shot. Dee Evans went out
at the window, and I saw him no more. Joe Evans came from around
the east end of the house pulling his gun, and he and Bennett began
shooting at each other some four or five shots; they were not more than
eight or ten feet apart. During that time Lula Bennett and I ran
around on the west end of the house, going to the south corner of the
house. Then all went north to the northwest end corner of the house.
The defendant and Joe Evans ceased firing about the time we left the
south side of the house and we ran. Joe Evans went around the east
and Bennett (the defendant) around the west end of the house. We
went around on the north side and defendant on the front side of the
house. Defendant came around the same side that we had gone. Joe
Evans went east. The first I saw of Joe Evans after the shooting was
on the north side of the house. There is a kitchen there, and Joe was
just above the kitchen. After we, Lula Bennett and myself, came
around to the northwest corner of the house, defendant came around
there and Joe had run around the other way. The defendant stopped
just above Lula Bennett and me, west of us, passing to a point where he
could see Joe Evans at the northwest corner of the house. We went
clear around the northwest corner, stopping right at the corner of the
house and defendant being about fifteen feet from us; we then turned
and ran the way we had come. There was some shooting done about
this time; some on the north side of the house. We, Lula Bennett and
I, were running down the west end of the house, going south; I was on
the inside next to the wall. We were side by side, and defendant to the
right side of us; I was looking back in the direction of defendant and
then saw him point his pistol towards Lula Bennett and me and saw
him shoot, and immediately thereafter Lula Bennett fell; we were then
at the southeast corner of the house. She fell at the southwest corner of
the house, partly around each way; that is, she could have been seen
from either way, where she was lying. Joe Evans was killed during the
last shooting between him and defendant.

The testimony showed that defendant used a 38-caliber pistol in the

shooting and Joe Evans a 45-caliber pistol. The physician who probed the wound on Lula Bennett, which entered her left side, said it was larger than the wound which killed Joe Evans. The undertaker testified that the bullet in Lula Bennet's body was a 45-caliber. Defendant contended that he did not fire the bullet that killed Lula Bennett, his wife, but that it was fired by Joe Evans, and that if a bullet from his pistol did strike her, it was an accidental shot, as he did not intend to shoot her.

The above statement together with that contained in the opinion sufficiently illustrate the points in the case.

*Walter Collins* and *C. M. Smithdeal,* for appellant.—On question of officers efforts to apprehend defendant:    Bennett v. State, 39 Texas Crim. Rep. 639.  On question of dying declarations:  I Greenleaf on Ev., 26 ed., sec. 158; Miller v. State, 27 Tex. Crim. App., 63; Sims v. State, 36 Texas Crim. Rep., 154; art. 788, C. C. P.; Taylor v. State, 38 Texas Crim. Rep., 552.  On question of impeachment:  Roach v. State, 41 Texas, 261; 2 Russell on Crimes, 925.  On question of new trial to introduce White's testimony:  Rucker v. State, 7 Texas Crim. App., 549; Id., 546; Jones v. State, 13 Id., 167; Gibbs v. State, 30 Id., 581.

*Howard Martin,* Assistant Attorney-General, and *C. F. Greenwood,* County Attorney, for the State.—On question of sufficiency of the predicate to introduce dying declarations:  Krebs v. State, 3 Texas Crim. App., 348; Miller v. State, 27 Id., 63; Fulcher v. State, 28 Id., 465; Polk & Watts v. State, 35 Texas Crim. Rep., 495.  On question of voluntary statement:  Brande v. State, 45 S. W. Rep., 17; Taylor v. State, 38 Tex. Crim. Rep. 552.  On question that written statement is best evidence:  Krebs v. State, 8 Texas Crim. App., 1; Drake v. State, 25 Id., 293; Black v. State, 1 Id., 368; Roberts v. State, 5 Id., 141.

BROOKS, JUDGE.—Appellant was convicted of murder in the second degree, the penalty assessed being eighteen years confinement in the penitentiary. This is the second appeal. See Bennett v. State, 76 S. W. Rep., 314.

Bill of exceptions number 2 complains that the State was permitted to prove by John Ward that defendant shot into the house where Dee Evans was. This testimony was part and parcel of the res gestæ of the shooting of deceased by appellant, her husband. The facts upon this appeal are practically the same as on the former appeal. There being a continuation of the shooting on the part of the appellant from the time the first shot was fired until deceased was killed, it becomes a part and parcel of the res gestæ of the transaction; and the court did not err in admitting said testimony.

The fourth bill complains that the court erred in permitting the testimony of John Stirmin, in which he relates the different means

and methods he used in order to ascertain the whereabouts of appellant. After the shooting appellant ran off. The State proved flight. Stirmin was permitted to state what extent he as sheriff went to ascertain the whereabouts of appellant. He testified to sending letters and telegrams to various points in the State of Texas, trying to find the whereabouts of appellant. Counsel in their brief insist that this was error in view of the fact that the testimony is undisputed on the question of the flight of appellant; that appellant's flight being conceded, it was error for the court to permit the sheriff to state that he attempted to find the whereabouts of defendant, since this would impress the jury with the idea that the sheriff thought defendant was guilty. We do not think this objection is tenable. If it is proper to prove flight, the extent of the flight can be proved as a circumstance to indicate guilt; and if a witness makes inquiry over the State of Texas as to the whereabouts of an accused, the extent of this inquiry would evidence the extent of his flight; at any rate would indicate that he had run beyond the jurisdiction of the court, and to that extent would be admissible. Counsel refers us to Bennett v. State, 39 Texas Crim. Rep., 679, in support of the proposition that the testimony is not admissible. We do not think this case is in point. There the sheriff was permitted to testify, that he had exercised every possible effort to ferret out the perpetrator of the crime, and had finally arrested defendant as the perpetrator. This would be getting before the jury the opinion of the sheriff, that defendant was guilty; but bare efforts on the part of a sheriff to ascertain the whereabouts of a party who has fled is not evidence that the sheriff believes such party is guilty, but is simply evidence of the fact of the flight and the extent of the flight.

Appellant objects to the following dying declaration, which was introduced in evidence on the trial, as shown by bill number 6: "Mount Calm, Texas, June 22, 1902.—Sworn Statement of Lula Bennett. My name is Lula Bennett. My husband Ben Bennett. I live in Waco, Texas. Dee Evans and I were sitting on the steps talking about shooting down at Day's Lake. A Mexican came up with some candy and he asked me if I wanted some, and I told him no. We were then talking about the shooting at Day's Lake. Bennett said, 'Why in the hell don't you all talk about something else;' and Dee Evans asked him if he was talking to him or his wife. And he said he was talking to both of us. Bennett then jumped up and pulled his gun, and Dee went back into the house, and I told him not to shoot in the house among the people, but he shot anyhow. After that he (Bennett) shot me." Suffice it to say that the proper predicate was laid for the introduction of this dying declaration. However, the court through extra precaution submitted the matter as a question of fact to the jury. Appellant objects to the dying declaration on the ground that the same shows that it was the statement of the officers rather than deceased; that the officers even lugged in the statement that Bennett shot Dee Evans first, which is not corroborated by any witness in the case. Appellant urges various other

objections to the dying declaration, but we deem it necessary to review only the one insisting that witness should only be allowed to testify orally to the dying declaration, and that a written dying declaration is not admissible in evidence. To sustain this proposition appellant has submitted a learned and lengthy argument. However, we have repeatedly held that a dying declaration, when proper predicate is laid, whether written or oral, is admissible testimony on the trial of the case. We do not think it violates the constitutional inhibition, either in letter or spirit. Taylor v. State, 38 Texas Crim. Rep., 552; Kenney v. State, 9 Texas Ct. Rep., 888.

Appellant complains of the following portion of the court's charge: "The evidence of the witnesses Fannie Alexander, Dink Alexander Berry Malcomb, and Lou Hays to the effect, and in substance, that the deceased, Lula Bennett, did not say at any time in their presence that she was shot while the defendant and Joe Evans were shooting at each other and she didn't know who shot her, was admitted for the sole purpose to be considered by you for what you may deem the same worth, if anything, as affecting the credibility of the witness Henrietta Edwards and you can consider the same for no other purpose." The record shows that the State introduced an oral as well as a written dying declaration. After which appellant placed on the stand Henrietta Edwards and Bettie Davis, both of whom testified, in substance, that they were with Lula Bennett after she was shot and after she was removed to Waco, and before she died, and that they heard her say that Joe Evans and Ben Bennett were shooting at each other, and she, Lula Bennett, got shot but did not know who shot her. After these witnesses for defendant had thus testified, and after defendant rested, the State called to the stand Fannie and Dink Alexander, Berry Malcolm and Lou Hays, all of whom testified in substance that they were with Lula Bennett a considerable portion of the time after she was carried to Waco wounded, and they did not hear her say at any time that Joe Evans and Ben Bennett were shooting at each other and she got shot and did not know who shot her. The charge of the court was not correct. Said testimony is not impeaching testimony in its legal aspect, as appellant insists.

The State's witnesses do not testify, as appellant insists, that they were present at the time that the defense witnesses say they heard deceased make the statement, but the substance of their testimony is that they were present during most of the time of deceased's last illness, and never heard the statement. The above statement shows that the State's witnesses were not present at the time the defense witness testified that she heard deceased make the dying declaration. And even conceding that the State's testimony was admissible, yet it was not admissible for the purpose of discrediting the testimony of the defense witness, and the court erred in so limiting the same. As appellant insists, the witness may be discredited (1) by cross-examination; (2) by contradictory statements; (3) proof of the acts and declarations;

and (4) general evidence of character. Russell on Crimes, p. 925. The evidence of the State does not come within any of the rules, and it was not incumbent on the court to limit it. The dying declaration testified to by the defense witness discloses that deceased said, among other things, that she did not know who killed her. Here the court, by the above quoted charge, is telling the jury that the negative testimony of the State's witnesses can be considered for the purpose of discrediting said witness who had testified to said statement. Negative testimony can not be used for the purpose of discrediting. The fact that the defense witness heard deceased make the statement testified to is not even disproved by the fact that three or four witnesses for the State testified that they were present most of the time and did not hear said statement. It follows that the court erred in giving this charge.

By the seventh bill of exceptions appellant complains of the failure of the court to grant him a new trial in order that he might avail himself of the testimony of the witness M. T. White. The substance of this bill, which is quite lengthy, is that White was the undertaker and testified on the former trial that the bullet extracted from the body of deceased was a 45-caliber. Deceased was shot only one time. Appellant's pistol was a 38-caliber. After the former trial witness White moved away to California, and appellant filed interrogatories to take his depositions. State's counsel neglected or failed to cross the same. The deposition was taken without being crossed. Thereupon the State, through the county attorney, procured the indictment of White for perjury, alleged to have been committed on the former trial of this case. By legal extradition he was brought back from the State of California on said charge of perjury. When defendant was tried, witness White was placed on the stand, and after testifying for defendant, as indicated above, the State, on cross-examination, without objection on the part of appellant, proved by said witness White that he was under indictment for perjury growing out of his false testimony in the previous trial of this case. Subsequent to this trial the witness White was tried for said perjury and acquitted; and appellant alleges in this bill, as a ground for new trial, that he was entitled to the testimony of said White untrammeled by the previous indictment; and he also urges that the indictment of White was procured for the express purpose and only for the express purpose of disqualifying and discrediting his testimony in this case. The fact that said indictment of White was secured for this purpose is practically uncontroverted in the bill of exceptions. If appellant had objected to any proof by the State of the indictment of White, and over his objections said proof was introduced and he had reserved a bill of exceptions to the introduction of such proof, then the question here insisted upon would have been in the shape authorizing this court to review it. But having permitted said testimony without any objection at the time of its introduction, to go before the jury, however erroneously it may have been introduced, we know of no precedent authorizing the granting of a new trial, because of such neglect to

make proper objection. The authorities cited by appellant in his able brief, to the effect, that where two are jointly indicted, both tried, and the second acquitted, and a new trial is insisted on for the first one tried, by virtue of said acquittal, do not apply here; because the witness White was not indicted for the same offense for which appellant was on trial, but was indicted for perjury growing out of the former trial of appellant. If proper bill of exceptions, as stated, had been reserved to this testimony, we hold that the same would have been error on another ground, to wit, the fact that a party has been indicted on testimony given in the trial of a case then on hearing, can under no circumstances be proved on that trial. To permit this would be authorizing the grand jury to throw the weight of its influence in favor of or against either side in the case then on trial, and unduly assist or prejudice one side of the litigation then before the court. This, we understand, is not proper under any practice; and is contrary to the holdings of the civil courts as to the admission of evidence. Casey-Swasey Co. v. Insurance Co., 8 Texas Ct. Rep., 150. However, we have no bill of exceptions; and the proposition before this court is, as stated, whether the testimony which has been erroneously introduced without objection, can be the basis on motion for new trial for the granting of the same? We hold not. We would not be understood as indorsing the effort on the part of the prosecuting attorney to disqualify the witness in the trial of the case. This practice has been very properly condemned and animadverted upon in Doughty v. State, 18 Texas Crim. App., 179; and we condemn such practice and here adopt the language there used as appropriate and pertinent to the facts shown.

For the error pointed out, the judgment is reversed and the cause remanded.

*Reversed and remanded.*