**SCHAEFFER, Extrx., Plaintiff-Appellant, v. DAVIS, Defendant-Appellee.**

Ohio Appeals, Seventh District, Mahoning County.

No. 3206.    Decided June 7, 1948.

Falls, Hazel & Kerr, Youngstown, for plaintiff-appellant.
Stephens & Young, Youngstown, for defendant-appellee.

## OPINION

By SKEEL, J.

This appeal comes to this court on questions of law from a judgment for the defendant in the common pleas court of Mahoning County.

The plaintiff decedent, Raymond Schaeffer, with two passengers was operating his Pontiac automobile in a southerly direction on South Avenue Extension toward North Lima, a short distance south of Youngstown, Ohio. The defendant with four passengers was driving a Ford automobile northerly on South Avenue Extension toward the City of Youngstown. When the two automobiles reached a point opposite the driveway of the "Guthrie Farm" they came into collision and as a result Schaeffer and his two passengers were killed and one of the defendant's passengers was also killed and the defendant was severely injured.

This action was instituted by the widow of Raymond Schaeffer as the Executrix of his estate on behalf of the next of kin, seeking to recover their pecuniary loss because of the wrongful death of said Raymond D. Schaeffer.

The plaintiff's theory of the cause of the collision is that as the deceased was operating his automobile southerly on South Avenue Extension and was approaching a small hill just south of the driveway of the "Guthrie Farm" the defendant driving north at said time and place came over the top of the hill at a high and dangerous rate of speed on the wrong or west side of the road and that to avoid the on-coming automobile of the defendant the deceased swerved to the left and was then struck by defendant's car on his right side with such force that the Ford automobile almost completely penetrated the Pontiac and drove it sidewise and to the north a considerable distance, both automobiles coming to rest almost completely off the pavement on the east side of the South Avenue Extension, a short distance north of the driveway of the "Guthrie Farm".

The plaintiff, to maintain her contention that negligence of the defendant was the proximate cause of the death of Raymond Schaeffer, produced a witness who was driving north on South Avenue Extension going to Youngstown and who came upon the accident very shortly after it had happened.

Before detailing his testimony it should be stated that the defendant had met several friends by appointment at the North Lima High School, all of whom were going to Youngstown to attend a meeting of the Hi-Y. That the defendant took four of the boys with him in his Ford automobile

and that there were at least two other groups that left at about the same time. The defendant started for Youngstown at about seven o'clock P. M.

The plaintiff's witness just referred to, left North Lima at about seven o'clock P. M., coming on to South Avenue Extension from Walker-Mill Road. After proceeding north toward Youngstown about 500 feet he was passed by another automobile going in the same direction. The witness testified that "I feel sure it was the car involved in the accident." When asked how fast the car that passed him was going he said:

"Well, in all justice I wouldn't like to estimate the speed because I might not estimate it accurately, but I would say in all fairness he was going considerably faster than I was."

He also testified he, the witness, was going between 40 and 45 miles per hour and upon being questioned further about the speed of the other automobile he testified:

"Q. In your best judgment was he going more than 50 miles per hour?

A. I would say yes.

Q. Would you say he was going considerably more than 50 miles per hour?

A. Well I could safely say yes to that, I believe."

The witness than said that the passing automobile went on ahead and he watched his tail light disappear in the distance. That he came upon the accident a mile or so beyond the point where the tail light disapppeared. That the time that passed between the two events was between two and three minutes and that no other automobiles passed him going south before he reached the place where the collision took place. The witness then volunteered the following:

"Q. As you proceeded on toward Youngstown after this car passed you and went out of sight will you tell us what you did and just what you saw? (Court: After the light disappeared.)

A. I don't know, when the light disappeared I had kind of a premonition something had happened."

The rest of the witness's testimony has to do with what he saw, and what he did at the scene of the collision. South

Avenue Extension is a two-lane highway with a white line down the center. The paved portion is twenty feet wide. There were some tire skid marks to the east of the center line of the road running diagonally in a northeast direction to the east edge of the pavement which the witness believed to be the marks of the Pontiac caused by it being pushed in that direction by the force of the impact.

The defendant was called for cross-examination who testified he started to Youngstown from the North Lima High School to attend a meeting of the "Hi-Y." He gave the names of his passengers four in number. The witness said he had no recollection of anything after leaving North Lima until he regained consciousness in the hospital which he testified was "a couple of days or more." This witness was than asked:

"Q. Do you know whether or not, Mr. Davis, that the Grand Jury of this county has returned an indictment against you?
Mr. Young: I object.
Court: Sustained."

Thereupon the defendant moved to withdraw a juror and the cause continued which motion was likewise overruled.

Three witnesses were called by the plaintiff who went to the scene after the collision but who could not testify to anything leading up to that event. One other witness was called who, at the time of the collision was near the garage of the Guthrie Farm working on a truck. The garage is back of the house and a little further north. The farm house is on the west side of South Avenue Extension. He testified that it was dark at the time of the collision and that the first thing that atracted his attention was that he "heard tires on the pavement." He thereupon testified as follows:

"A. Of course, I looked in the direction of the sound and I saw a blue 1941 Pontiac.
Court: You saw What?
A. A blue '41 Pontiac.
Court: And, in which direction was the Pontiac traveling?
A. Sideways.
Q. In which direction?
A. That would be South.
Q. Going South?
A. That is right.
Q. It would be going in a South-easterly direction at the time you saw it?

A. The direction of the car, yes.

Q. What else did you observe, you saw the Pontiac, did you see any other automobile?

A. No, not at that time.

Q. What did you next observe about the collision?

A. About that time I heard a car further south on South Avenue.

Q. A car further south on South Avenue?

A. That is right.

Q. And in which direction was that car traveling?

A. He was headed toward town.

Q. Where was that car when you first saw it, that is, the one going toward town?

A. There was kind of a gully runs through the orchard to the south, for about a couple hundred feet on the road.

Q. And that was the car that was going toward Youngstown?

A. Yes, sir.

Court: How far away was that car from you?

A. I wouldn't say how far it was away from me.

Q. When you first saw the car was it south of your house?

A. Yes.

Q. Can you tell us about how far south from your house it was when you first saw it?

A. I couldn't tell you that.

Q. Did you see its lights?

A. Yes.

Q. Did you hear its motor?

A. Yes, sir.

Q. What did you hear in connection with its motor?

A. It had a whine like all Fords have.

Q. Did that whine indicate anything to you about the speed at which it was traveling?

A. Not necessarily.

Q. Do you know which side of the road it was on?

A. No, I couldn't say that either.

Q. And did you continue to watch that car and the Pontiac?

A. By that time neither car was in sight.

Q. Both of them were out of sight?

A. That is right.

Q. Were they out of sight by reason of the embankment that goes from the road up to your house?

A. That is right.

Q. That embankment obscured your view?

A. That is right.

Q. Did you see either of the cars after that time and before the collision?

A. No, sir.

Q. Did you see the headlights of the car going towards Youngstown shining on the Pontiac?

A. Well, there were lights shining on the car, of course, to be able to tell the color of it.

Q. It was the lights of the car going toward Youngstown shining on the car going south that enabled you to tell the color of the car?

A. That is right.

Q. How close together were the two automobiles when you last saw them?

A. I couldn't tell you that either.

Q. Now, I take it from what you say, you didn't see these two automobiles collide?

A. That is right.

Q. Do you know now they did collide?

A. Yes.

Q. Did you hear the sound of the collision?

A. Yes, sir.

Q. When you heard the sound of that collision where were you?

A. Oh, I would say I was two-thirds of the way to the back door.

Q. That is, from the time you saw the two automobiles on the highway you had left your truck and had started to the house?

A. That is right.

Q. For what purpose?

A. Oh, I knew there was going to be some kind of an accident.

Q. What was your purpose of going to the house?

A. To use the telephone."

This witness was also asked:

"Q. Do you know now at what point of the highway the two cars collided with each other?

A. I couldn't tell you."

As a part of the plaintiff's case a picture of the instrument board of the Ford automobile taken the next day at "Red's Garage" was received into evidence. It showed the broken speedometer with the hand pointing at 72. The hand is completely out of position having dropped down from its normal place and the broken glass which covered the face of the speedometer was lodged against it.

A careful examination of the evidence offered by the plaintiff discloses that there is not one word of direct testimony either as to the speed of the defendant's automobile at about the time of the collision or that it was being driven on the west or wrong side of South Avenue Extention at the time it came over the small hill just before the accident took place, nor is there any testimony from which such facts could be inferred as is contended by the plaintiff.

The defendant's case was supported by a number of witnesses who were either in the defendant's car or were riding in another car taking members of the group to the "Hi-Y" Meeting or who heard of the accident and went to the scene shortly after it occurred. The witnesses who arrived after the accident and who observed the Ford Automobile both there and after it had been taken to "Red's Garage" said the speedometer hand pointed at zero. Only one of the defendant's witnesses (a passenger in the defendant's automobile) gave testimony as to what he saw up and until the time of the collision. He was sitting on the back seat with his arms resting on the back of the front seat. His version of the circumstances leading to the accident were that the defendant was driving north on the east side of the road at a normal rate of speed (about 50 miles per hour). He noticed (just as they proceeded over the top of a small hill) either a standing or slow moving vehicle headed south on the west side of the highway. He thinks when he first saw it, it was about a quarter of a mile or less away. Just as they passed the vehicle another vehicle headed south turned directly into the path of defendant's automobile. The defendant's automobile hit the right side of the last described vehicle and the witness was rendered unconscious and could give no further details.

The plaintiff claims the following errors:

First: "The trial court denied plaintiff the right to offer and excluded from the consideration of the jury evidence proving that the defendant, Robert Davis, and other defendant witnesses knew, at the time of testifying, in an unbelievable manner, that Robert Davis, the defendant, was under indictment for manslaughter for causing the death of plaintiff's decedent and his two passengers.

Second: The Court, having erroneously excluded evidence of the indictment in the presence of the jury and instructing the jury to disregard the question erred in refusing plaintiff's request to withdraw a juror and continue the case.

Third: The trial court erroneously charged the jury on the question of contributory negligence.

Fourth: Although the evidence clearly established that plaintiff's decedent was confronted with a sudden emergency created solely by the defendant, the trial court on request refused to charge the jury on the law applicable to such emergency situation.

Fifth: The verdict of the jury and the judgment of the court are contrary to the evidence and against the manifest weight thereof.

Sixth: The verdict of the jury and the judgment thereon are contrary to law."

The first claim of error is not well taken. The plaintiff's claim is that she has a right to show that the defendant has been indicted as a result of the events which constitutes the basis of her action and that the fact of the indictment is a circumstance which the jury would have a right to consider in valuing his testimony for the reason that he would be influenced by such circumstance to protect his own interests.

The right to show that the interests of a witness are antagonistic to the plaintiff's claim is unquestionably supported by the great weight of authority. But there is of necessity limitations to the rule.

In the first place the extent to which a party or witness may be subjected to cross-examination is within the sound discretion of the court. In Jones' Commentaries on Evidence, Vol. 5, Page 4639, parag. 2365 under the title "Discretion of Trial Court" the author says:

"The only conclusion which may justifiably be drawn from the cases as a whole is that a trial court is left a certain inherent discretion in the great majority of jurisdictions as to the allowance on cross-examination of questions, the answers to which involve only matters wholly collateral to the principal issue but which would tend to debase or degrade the witness. Witnesses may be cross-examined as to specific facts, though not pertinent to the issue, which tend to discredit the witness or impeach his moral character and credit, when there is reason to believe that such examination will tend to the ends of justice; but a cross-examination of this character ought not to be allowed when it seems unjust to the witness and uncalled for by the circumstances of the case." * * *

"According to this view, it may, as a rule, be safely left to the trial court to control the inquiry. It is proper for him to permit questions tending to disgrace the witness, if in an important way they affect his credibility. But on the

other hand, he should protect the witness from insult and indiscriminate attacks or questions which are evidently caused by mere caprice or resentment. It is his duty to exclude inquiry as to transactions too remote to affect credibility. And generally this discretion of the trial court is to be exercised in view of the evidence already introduced and the testimony of the witness in the direct examination and all the circumstances of the case."

The fact that the admissibility of such evidence must be left to the sound discretion of the court is supported by a statement found in Jones' Commentaries on Evidence, Vol. 5, Sec. 2371 found in the last part of the second paragraph on page 4664:

* * * "The possible danger of permitting such questions as a matter of right is illustrated by a case from that (Texas) Jurisdiction wherein it appeared that the state's attorney procurred an indictment for Perjury against a witness for the defendant at a previous murder trial for the purpose of discrediting the evidence of the witness upon the second trial. It was held, of course, that under such circumstances the finding of such an indictment should not be admitted to discredit the witness by inference." * * *
Bennett v. State 47 Texas Crim. 52 81 S. W. 30.

So, while a party should have a reasonable latitude in the cross-examination of an adverse party to establish conflicting interests that might influence his testimony such right ought not to be used in absolute disregard of other well-established rules of evidence.

In challenging the credibility of a party the fact that he has been found guilty of a crime involving moral turpitude may be shown. But it must be shown that he was convicted of such crime and it is not sufficient to show only that he has been indicted. This fact was brought out in the case of Keveney v. State, 109 Oh St 64. Paragraphs 2 and 3 of the syllabus read as follows:

"2. The mere fact that an indictment has been returned affords no presumption or inference of guilt.

3. Where for the sole purpose of impeachment, evidence of other indictments is offered against the defendant or a witness, not followed by a proper showing of final conviction,

nor of being a fugitive from justice, upon such charge, a motion to strike such evidence from the record and caution the jury to disregard it should be sustained by the court."

The plaintiff relies strongly upon a statement on the subject of showing bias, in Wigmore on Evidence, Vol. 3, paragraph 949, at page 503 where the author says:

"That the witness is or has been under indictment may have several bearings:
(1) If the indictment, present or past, was had by the opponent's procurement or for an injury to him, it is relevant as having tended to excite in the witness a hostile feeling in him."

All of the cases cited in support of this statement of the rule are criminal cases and each case presents special circumstances that under the facts of the particular case the court in the exercise of sound discretion admitted into evidence the fact that the witness was under indictment. Let it be supposed for example that an accomplice has turned State's evidence. Certainly the right to cross-examine such a witness on the subject of his indictment for the same offense should be allowed because it would tend to show that by testifying for the State he is seeking to benefit himself to the prejudice of the defendant.

No unusual circumstances are disclosed by the evidence in the case now being considered either that the plaintiff had anything to do in seeking the indictment of the defendant or any other circumstance that would justify a reviewing court in holding that the trial judge was guilty of an abuse of discretion in sustaining an objection to a question directed to the defendant on cross-examination seeking to show that he was then under indictment.

Coming to this conclusion on the first assignment of error it follows that the second assignment of error is not well taken. If the court properly sustained the defendant's objection to plaintiff's tender of proof seeking to show that the defendant had been indicted, which indictment was founded on the same events upon which the plaintiff's action is based for the purpose of showing defendant's hostile attitude toward the plaintiff, the fact that the court instructed the jury to disregard the question and refused to continue the case to a future trial would not constitute prejudicial error. Under such circumstances the defendant and not the plaintiff was prejudiced by the asking of an irrelevant question.

The third assignment of error has to do with the fact that the court gave a charge on contributory negligence. The plaintiff finds no fault with the charge as given but claims there was no credible evidence in the record to support it. The plaintiff's evidence established the fact that the collision occurred to the east of the center line of South Avenue Extension. In attempting explanation of the deceased being on the left hand side of the road while driving in a southerly direction she argues that the only way such a circumstance could come about is because the defendant driving at a high and dangerous rate of speed came over the brow of the hill on his wrong side of the road presented a sudden emergency, causing the deceased in an attempt to avoid being struck to swerve to the left. It is claimed that this is the only way it could have been possible for the defendant to hit the right side of the deceased's automobile when the two vehicles came into collision while being driven in opposite directions.

The answer to this argument is that there is no evidence in the record to show that the defendant was driving on the wrong side of the road. The plaintiff's witness who was at the garage a considerable distance from the west side of the road testified his attention was attracted by the sound of tires skidding on the pavement and when he looked up he saw the deceased's automobile travelling "sideways." The Sheriff's report shows skid marks for 140 feet caused by the deceased's automobile going up a slight grade and swerving to the east side of the road at the end of the skid. One of defendant's witnesses testified directly that the defendant was driving on the right side of the road when suddenly the deceased's automobile swerved left from behind another vehicle going South directly into the defendant's path. The evidence therefore completely justified and required a charge on contributory negligence.

Also, there being no credible evidence that the defendant's conduct created a sudden emergency the court was correct in refusing to charge on that subject.

A careful examination of the entire record disclosed that the verdict and judgment is not against the manifest weight of the evidence or contrary to law.

For the foregoing reasons the claims of error of the plaintiff are overruled and the judgment of the court of common pleas of Mahoning county is affirmed. Exceptions noted.

HURD, PJ, MORGAN, J, concurs.